1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 2:07-cr-00038-PMP-PAL |
| | ) | **REPORT OF** |
| vs. | ) | |
| | ) | **FINDINGS AND RECOMMENDATION** |
| NATHAN MITCHEL GONZALES, | ) | |
| Defendant. | ) | (M/Suppress - #12) |
| | ) | |

Before the court is defendant's Motion to Suppress Evidence for Fourth Amendment Violations (#12) which was referred to the undersigned for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-3 and IB 1-4.  The court has considered the motion, the government's Opposition (#17), and the testimony adduced at an evidentiary hearing conducted May 24, 2007.  Shari Kaufman appeared on behalf of the defendant, and Ray Gattinella appeared on behalf of the government.  For the reasons set forth below, it is the recommendation of the undersigned that defendant's Motion to Suppress be denied.

**BACKGROUND**

The defendant, Nathan Mitchel Gonzales ("Gonzales"), is charged by way of an indictment returned February 28, 2007 with knowingly possessing a machine gun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).  The indictment also contains a forfeiture allegation.  According to police reports relied on by both parties and attached to the government's opposition as Exhibits A, C, E and G, the indictment arises out of a bank robbery investigation. A "B-pack" tracking device was attached to cash taken in the robbery which ultimately lead police to follow a vehicle Gonzales drove into a parking lot of a shop.  Gonzales was arrested returning to the vehicle from the shop after being confronted by a police detective and admitting to possessing a firearm.

Gonzales argues his Fourth Amendment rights were violated because he was stopped and searched without reasonable suspicion.  Gonzales contends the officers were not justified in stopping and searching him because there were no objective factors indicating he was involved in criminal conduct.  He argues the officers did not have reasonable suspicion to detain him for investigative purposes because he did not match the description of the bank robber, the car in which he was driving was not identified by anyone as a vehicle involved in the robbery, and there was no signal indicating the B-pack was in the vicinity at the time he was detained.  Absent reasonable suspicion to stop him, law enforcement officers were prohibited from conducting a pat down search for weapons.  Finally, without reasonable suspicion, the stop and search of Gonzales was unconstitutional and under the "fruit of the poisonous tree" doctrine, the tangible evidence and testimony must be suppressed.

The government opposes the motion, asserting that under the totality of the circumstances the officers had reasonable suspicion to detain Gonzales because the car Gonzales had been driving matched the description of one of two vehicles that produced a strong B-pack signal shortly after the robbery, the driver of the second of the two vehicles had been eliminated as the perpetrator of the robbery, the passenger in Gonzales's vehicle matched the description of the robber and Gonzales was stopped along with the passenger leaving a shop in geographic and temporal proximity to the robbery.  The government also argues the pat-down search of Gonzales was lawful because the officer had reasonable suspicion Gonzales was armed because when Gonzales was ordered to the front of the patrol vehicle, he stated "I have a gun."  Additionally, investigating officers knew the robber's demand note stated he had a gun which could have been in the possession of either suspect detained in the parking lot at the time of Gonzales' arrest.

At the evidentiary hearing, the government called three witnesses: Officer Sean Davideit, Detective Lewis Araujo and Detective Gordon Martines.  Gonzales did not call any witnesses, and did not testify, but was canvassed on the record and acknowledged he understood his constitutional right to testify or not.

**Testimony of Sean Davideit**

Officer Sean Davideit ("Officer Davideit") has been with Las Vegas Metropolitan Police Department ("LVMPD") for eight years and is currently a patrol officer with the South Central

1   Command.  His police vehicle is a marked car equipped with a B-pack tracking device with an arrow

2   indicator that rotates 360 degrees and bars that go from levels one to twelve.  The arrow points in the

3   direction of the B-pack signal, while the bars indicate the proximity of the police vehicle to the B-pack;

4   one bar is the greatest distance from the B-pack and twelve bars indicates it is within a few feet.

5   B-packs are placed on bank notes used as bait money to track and locate bank robbers.

6          On the morning of February 13, 2007, Officer Davideit responded to a bank robbery call from

7   dispatch at 10:25 a.m.  The bank robbery occurred a few minutes prior at a Nevada State Bank in a

8   Smith's grocery store on Windmill and Eastern.  Officer Davideit turned on his lights and sirens and

9   headed toward the area.  At 10:35 a.m., Officer Davideit was nearing the intersection of Las Vegas

10  Boulevard and Windmill, approximately three miles from the robbery, when his B-pack tracker detected

11  a signal.  As Officer Davideit approached the intersection, the bars on the tracking device reached level

12  twelve.  He notified dispatch he detected a "hot" B-pack while heading south on Las Vegas Boulevard.

13  Officer Davideit pulled behind a black pickup truck and a teal green Chrysler 300.  He could not

14  determine which vehicle contained the B-pack.  The black pickup truck headed north on I-15 and the

15  Chrysler 300 went north on Las Vegas Boulevard.  Officer Davideit followed the black pickup because

16  the driver, like the robbery suspect, was a black male.

17         Officer Davideit followed the black pickup to I-15 and Sahara, where he made a traffic stop

18  with another officer around 10:45 a.m.  Detective Araujo also arrived during the stop.  The bank teller

19  came to the scene and confirmed the driver of the pickup truck was not the bank robber.  Officer

20  Davideit described the other vehicle he had observed at the intersection of Las Vegas Boulevard and

21  Windmill as a teal green Chrysler 300 with tinted windows, chrome wheels, and a cracked bumper to

22  other officers and detectives involved in the investigation.  The B-pack tracking device activated again

23  and Officer Davideit headed south on I-15 in his police vehicle, accompanied by the detectives in their

24  unmarked cars.  Around 11:51 a.m., Officer Davideit arrived in the parking lot of a store called The

25  Smoke Shop, where detectives had two men in custody.  He identified the same Chrysler 300 he

26  encountered earlier at the intersection of Las Vegas Boulevard and Windmill in the parking lot of the

27  Smoke Shop where the two men were in custody.

28         On cross-examination, Officer Davideit testified he spoke with AUSA Ray Gattinella the

3

1   Monday before testifying at the evidentiary hearing.  When he met with Mr. Gattinella, he did not have

2   the CAD [Computer Automated Dispatch]  report and believed approximately thirty minutes elapsed

3   between the time he registered a twelve-bar reading on his tracking device behind the Chrysler and the

4   pickup, and the time of Gonzales' detention in the parking lot of The Smoke Shop.  He testified that his

5   memory was not exact, and that he had relied on a report of another officer to help refresh his

6   recollection.  The other officer's report reflected Gonzales was arrested at 10:49 a.m., which is why he

7   believed the time frame was thirty minutes when he initially spoke with Mr. Gattinella on Monday

8   before testifying.

9         Davideit stated  the description of the bank robber provided by dispatch was a black male, 6'1",

10  approximately 230 pounds, wearing a black long sleeve shirt and a baseball cap.  Dispatch gave no

11  vehicle description indicating the suspect fled on foot.  Officer Davideit clarified he was initially

12  headed south on Las Vegas Boulevard when he encountered the black pickup and Chrysler 300.  As he

13  approached Windmill, the bars on the B-pack tracking device registered level twelve.  The black pickup

14  was on his far left and the Chrysler 300 was right next to him on his left at the intersection.  The arrow

15  on his tracking device pointed to the left of his patrol car.  He went through the intersection, made a

16  U-turn, and pulled up behind the black pickup truck and the Chrysler 300.  The tracking device in his

17  patrol car indicated the B-pack was in close proximity, but it was not clear which vehicle was the

18  source.  Officer Davideit asked dispatch for a description of a suspect vehicle and was informed there

19  was none.  Davideit also asked for air support.

20        Officer Davideit reported to dispatch "negative on the Chrysler," by which he meant he had

21  decided to follow the black pickup truck because he could see that the driver, like the robber, was a

22  black male.  The Chrysler 300 had dark tinted windows.  Davideit acknowledged that Air Support

23  reported that the suspect in the pickup truck was a white male, which was incorrect.  The Air Support

24  unit was 500 feet in the air.  Davideit did not ask dispatch to assign another police vehicle to follow the

25  Chrysler 300, but gave the dispatcher the license plate information on the Chrysler.  Although he did

26  not include this information in his written report, and it is not reflected in the CAD report, Davideit

27  observed two people in the Chrysler 300.

28        Davideit acknowledged that according to the CAD report, no towers in the valley registered

"hot" at 10:35 a.m., the time he was getting a twelve bar reading at Las Vegas Boulevard and Windmill.
The CAD report reflects the last hot tower was at 10:28 a.m.  Air Support also reported there were no
hot towers.  From 10:28 a.m. until 11:24 a.m., the CAD report reflects all the towers were "cold."  The
CAD report also does not indicate Officer Davideit reported he was getting a twelve bar reading to
dispatch.  However, in his experience, the CAD reports are often incomplete.  After listening to
portions of the radio traffic in court, Davideit acknowledged the dispatcher broadcast a description of a
"cream" Chrysler.  Officer Davideit did not correct the dispatcher and tell her it was "green" because he
did not hear her incorrect description at the time she gave it.

Officer Davideit did not activate his emergency lights while pursuing the black pickup truck on
I-15 because he was waiting for backup.  While pursuing the black pickup, the bars on the B-pack
tracking device were at zero because all the towers were cold.  The FBI also responded to the area of
I-15 and Sahara where the pickup was stopped.  Officer Davideit remained there from approximately
10:45 a.m. until 11:24 a.m.  The West Henderson tower was hot between 11:24 a.m. and 11:26 a.m.;
the South Coast tower was hot at 11:27 a.m.  Around 11:48 a.m., Officer Davideit got a call to identify
a vehicle on Windmill while he was in the area trying to get a reading on his B-pack tracking device.
When he arrived, two men were already in handcuffs.  One of the men, later identified as Gonzales, did
not match the description of the robbery suspect.  The other man who was detained, later identified as
Dexter Logan, was bald, wore a white t-shirt, and had a beard and mustache.  The bank robber was not
described as bald, wearing a white t-shirt, or having a beard or mustache.

On re-direct, Officer Davideit testified a baseball cap and long sleeve shirt were found in the
Chrysler 300.  He did not know whether it was possible for bars to display on a B-pack tracker without
a hot tower.  In Officer Davideit's experience, CAD reports of radio traffic between officers and
dispatch, including the status of the towers, are often incomplete.  Officer Davideit clarified that during
his original encounter with the Chrysler 300 at Las Vegas Boulevard and Windmill at approximately
10:45 a.m., the arrow on the B-pack tracking device bounced between both vehicles.  This investigation
was stressful because dispatch was giving out a lot of information, and Officer Davideit was aware the
robbery suspect had a gun.  On re-cross examination, Officer Davideit stated no bars were active on the
B-pack tracking device at the scene of Gonzales' arrest, and he did not know if a B-pack was found in

1   the Chrysler 300.

2   **Testimony of Lewis Araujo**

3          Lewis Araujo has been a detective with LVMD for eighteen years and with the robbery division

4   for six years.  He has made over one hundred arrests.  He received training in B-pack technology and

5   has eighteen years of experience using it.  During his six years with the robbery division, he has used

6   the B-pack technology thirty to forty times per year and has a B-pack tracking device in his police

7   vehicle.

8          The B-pack is a small device placed in stolen money that emits a radio frequency.  A series of

9   towers located throughout the valley detect the B-pack's radio signal.  A "hot" tower indicates a B-pack

10  transmitter is located in the general vicinity.  A device in a police vehicle can also detect a B-pack

11  signal.  Twelve bars on the B-pack tracking device means the B-pack is within one to two feet.  B-packs

12  often go back and forth from hot to cold.  In Detective Araujo's experience, if a device goes cold it

13  means the suspect has tampered with the device.

14         Dispatch announces whether towers are hot or cold over the radio and types that information

15  along with a summary of other radio traffic in a CAD report.  Dispatch cannot type fast enough to keep

16  up with the stream of multiple conversations, so the CAD reports are often incomplete.  Between

17  10:20 a.m. and 10:25 a.m. on February 13, 2007, Detective Araujo was in his office when dispatch

18  broadcast there was a hot tower in the southeast area of the valley.  He heard that Officer Davideit

19  detected a signal coming from one of two vehicles and was following a black pickup truck with out-of-

20  state plates.  Araujo headed in Davideit's direction in his unmarked vehicle with his lights and sirens

21  on.  He pulled up to I-15 and Sahara where the pickup had been stopped as a black male was getting

22  out.  The bank teller was brought to the scene of the stop and said the man was not the bank robber, at

23  which point he was released.

24         Detective Araujo spoke with Officer Davideit at the scene of the traffic stop about the Chrysler

25  300, with other officers within earshot.  Officer Davideit told him the Chrysler 300 was teal green with

26  dark tinted windows, chrome custom wheels, and the right rear bumper was cracked.  As Officer

27  Davideit and Detective Araujo were talking, dispatch advised the south tower was hot again.  Detective

28  Araujo headed toward South Las Vegas Boulevard with his lights and sirens on and directed other

1   police vehicles to different exits to see if they detected a B-pack signal.  Detective Araujo was

2   searching for a B-pack signal, as well as the Chrysler 300.

3          Detective Araujo pulled into a shopping center on Windmill, east of Las Vegas Boulevard.  As

4   he sat in his vehicle observing traffic, he noticed a teal Chrysler 300 with a broken bumper coming off

5   of Windmill.  At approximately 11:45 a.m., the car went past the detective and pulled in front of a store

6   called The Smoke Shop.  The Chrysler 300 had dark tinted windows, and he could not see inside.

7   Detective Araujo conceded he incorrectly typed 10:49 a.m. as the time he observed the Chrysler in his

8   report, instead of 11:45 a.m., described it as a typo, and stated he was not a very good typist.  Detective

9   Araujo sat in his vehicle and observed the Chrysler 300 using binoculars.  He reported the license plate

10  information to dispatch and watched as the occupants got out of the vehicle.

11         The bank robber was described as a black male in his thirties, 6'1", 230 pounds, wearing blue

12  jeans, a long-sleeved shirt, and a baseball cap.  At some point, Detective Araujo heard over radio traffic

13  the bank robber had a light beard or stubble.  The passenger who got out of the Chrysler 300 had a light

14  beard or stubble.  The passenger matched the description of the robber.  Araujo described the passenger

15  as a black male, 6'1" to 6'2", large build, with a big belly and scraggly beard.  Although the passenger,

16  Logan, was not wearing a long-sleeved shirt or a baseball cap, in Detective Araujo's experience, bank

17  robbers often change their clothing after a robbery.  Detective Araujo was also aware from listening to

18  radio traffic that the suspect said he was armed at the time of the robbery.

19         The occupants of the Chrysler 300 were in The Smoke Shop for a short time.  When they left the

20  store, Detective Araujo activated his lights and pulled directly behind the vehicle as the driver, later

21  identified as Gonzales, and the passenger, later identified as Logan, were getting into the vehicle.

22  Detective Araujo identified himself as a police officer, and Gonzales immediately stated he had a gun

23  while taking a step toward the detective.  Gonzales' stance and the manner in which he held his hands

24  suggested to Detective Araujo that Gonzales wanted to fight.  Detective Araujo drew his weapon and

25  ordered Gonzales and Logan to put their hands in the air.  As he did so, Agent Wenko arrived to his

26  right, and Detective Martines arrived from behind.  Gonzales and Logan put their hands on Detective

27  Araujo's vehicle.  Detective Araujo informed Detective Martines that Gonzales stated he had a gun.

28  Detective Martines placed Gonzales in handcuffs, patted him down, and discovered a 9mm Glock

1    handgun.  Detective Martines handed Detective Araujo the gun, which was placed on the trunk of the

2    Chrysler 300.

3          After the suspects were secured, Araujo noticed the gun had been converted to a fully automatic

4    weapon by adding a selector switch to the back.  The bank teller was brought to the parking lot and

5    identified Logan as the robber.  Araujo listened to radio traffic before testifying and described the

6    environment while the police were in pursuit of the robbery suspect.  There was a lot of noise and heavy

7    traffic.  The radio traffic in his detective vehicle is not as clear as the radio in a patrol car.  His phone

8    was ringing from calls received from his sergeant and other detectives, and the environment was

9    generally stressful.

10         On cross examination, Detective Araujo conceded that the phrase "negative on the vehicle"

11   which Davideit said over the radio generally means the Chrysler was not the suspect car.  It is possible

12   to get a signal on the B-pack tracking device in a police vehicle without a hot tower.  His report does

13   not indicate he received the description of the Chrysler from Officer Davideit.  In the parking lot of The

14   Smoke Shop, Detective Araujo decided he would not let the Chrysler 300 leave the scene.  He could not

15   recall where he heard the additional description the robber had a beard.  Gonzales did not match the

16   description of the robbery suspect, and there was no information a car was connected to the bank

17   robbery.  Detective Araujo ran the license plate on the Chrysler 300 which was negative for wants or

18   warrants.

19         The B-pack tracking device in his police vehicle did not register as Detective Araujo pulled

20   behind the Chrysler 300 in the parking lot of The Smoke Shop.  Araujo heard "U.S. 350," indicating

21   FBI Agent Wenko was arriving.  Detective Araujo reiterated Gonzales stated "I have a gun" before

22   Araujo ordered the two men to put their hands in the air and come to the front of his police vehicle.

23   However, he later acknowledged that his police report indicates he pulled his weapon, ordered the two

24   men to the front of his car, and then Gonzales stated he had a gun.  He also conceded that his report was

25   probably more accurate than his recollection while testifying on this point.

26         Detective Araujo did not make the arrest, did not test fire the gun recovered from Gonzales, and

27   did nothing to determine if it was an automatic.  Gonzales was detained while officers investigated.  In

28   Detective Araujo's experience, bank robbers often have getaway drivers, and during the initial detention

1   Araujo did not know if Gonzales was involved in the bank robbery.  He stopped the vehicle because the
2   passenger fit the description of the robber and he knew Officer Davideit had been getting a strong signal
3   from the Chrysler 300 before the black pickup was stopped.  The Chrysler 300 he saw fit Davideit's
4   description and specifically had a cracked rear bumper.  Officer Davideit also told Detective Araujo
5   there were two people in the Chrysler 300.  After refreshing his recollection from the CAD report, he
6   recalled dispatch reported that the suspect in the robbery was a black male adult with a beer belly and a
7   light or full beard.

8          At some point, a computer check revealed Gonzales had a permit to carry a concealed weapon,
9   but Araujo did not recall Gonzales stating at the scene that he had a concealed weapon permit.

10  **Testimony of Detective Martines**

11         Detective Martines has been with LVMPD for twenty-nine years and with the robbery and
12  homicide section for about twelve years.  He responds to in progress bank robberies and has had several
13  training courses, including a course on the B-pack tracking system.  The B-pack tracking system can
14  hone in on a B-pack through a handheld tracking device or a device in a police vehicle.  With each B-
15  pack system upgrade, Detective Martines received training classes which included a mock tracking.

16         On February 13, 2007, Detective Martines was in his office on Oakey and Decatur when he
17  learned of a bank robbery at approximately 10:23 a.m. and drove toward the location of the robbery.
18  Dispatch indicated the money the robber was given at the bank had a B-pack device in it.  The robber
19  was described as a black male, 6'1" to 6'2", with a beer belly wearing a hat, a dark shirt and dark pants.
20  It was later reported the robber had a beard.

21         Detective Martines went to the area of Windmill and Las Vegas Boulevard because he heard
22  over the radio Officer Davideit's tracking device detected a B-pack signal.  From the radio traffic, it
23  was unclear if the B-pack was in a teal green Chrysler 300 with a cracked bumper or a black pickup
24  truck.  Before going to the Windmill and Las Vegas Boulevard area, Detective Martines went to Sahara
25  and I-15 where the black pickup truck was stopped.  Martines learned of no new information about the
26  Chrysler 300 while the pickup was stopped but felt it made sense to search for the Chrysler after the
27  tower went hot again.  After the driver of the pickup truck was released, Martines headed toward
28  Windmill and Las Vegas Boulevard where the tracking device first "hit" and cruised the neighborhood

1   looking for the Chrysler 300.

2       Detective Martines received a call from Detective Araujo reporting that the Chrysler 300 had

3   pulled into a shopping center and went to back up Detective Araujo.  Araujo was the only police officer

4   on the scene when Martines arrived in the parking lot of the shopping center.  The two occupants of the

5   Chrysler 300, later identified as Gonzales and Logan, were being detained at gun point with their hands

6   on the Detective Araujo's vehicle when Detective Martines arrived.  Detective Martines thought Logan

7   matched the description of the robber.  Martines handcuffed Gonzales, patted him down, and found a

8   gun on his right side under his shirt.  At first, Martines did not notice anything unusual about the gun,

9   but later noticed a toggle was attached to the gun to make the weapon fully automatic.

10      On cross examination, Detective Martines testified he did not recall hearing information that a

11  car was used in connection with the bank robbery.  The vehicle description he was looking for came

12  from Officer Davideit, not the bank.  The information from the bank was that the robber had fled on

13  foot.  Detective Martines did not have a B-pack tracking device in his vehicle, and went to the shopping

14  center to back up Araujo.  Martines did not hear radio traffic reporting "negative on the Chrysler," and

15  did not know if he learned of the vehicle description from information reported on the dispatch radio,

16  his Nextel cell phone, or the walkie-talkie he had with him that day.  He received information from all

17  of these sources during this investigation.  The B-pack tracking towers indicate the general vicinity

18  where a B-pack is located.  The B-packs and the towers that register the devices are a tool the police

19  use.  The system has worked and failed, gone hot and cold, and sometimes given false alarms.  It is

20  helpful to the police but he would not necessarily rely upon it.  Martines was about a half block away

21  when he heard Detective Araujo's call about the Chrysler.  When he arrived in the parking lot, he

22  thought the suspect looked like the bank robber.  Although Gonzales did not match the description of

23  the bank robber, Logan was a fairly close match.  Detective Martines conceded that Logan was wearing

24  different clothes and that police records reflect he is both shorter and heavier than the description

25  provided for the robber.  To Martines, Logan appeared to be in his mid to early 30s as the bank robber

26  was described.

27                                          **DISCUSSION**

28      The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

10

1  papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth

2  Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S.

3  347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation

4  of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the

5  poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

6      **A.    Gonzales' Detention**

7      Gonzales asserts his Fourth Amendment rights were violated because he was unlawfully seized

8  in the parking lot of The Smoke Shop without reasonable suspicion. For Fourth Amendment purposes,

9  the seizure of a person occurs when a law enforcement officer in some way restricts the liberty of a

10 citizen, either by physical force or show of authority. Florida v. Bostick, 501 U.S. 429, 434 (1991). A

11 citizen's liberty is restrained if, "taking into account all of the circumstances surrounding the encounter,

12 the police conduct would 'have communicated to a reasonable person that he was not at liberty to

13 ignore the police presence and go about his business.'" Id. at 437, quoting, California v. Hodari D., 499

14 U.S. 621, 628 (1991). In United States v. Drayton, 536 U.S. 194 (2002), the Supreme Court reaffirmed

15 the holdings in Bostick and Hodari D. that to determine whether an individual has been seized for

16 Fourth Amendment purposes the court must consider the totality of all the circumstances surrounding

17 the encounter. The reasonable person test is an objective one and "presupposes an *innocent* person."

18 Id. at 202, quoting, Bostick, 501 U.S. at 437-38 (emphasis in original).

19     It is clear, and the court finds, Gonzales was seized for purposes of the Fourth Amendment

20 when Detective Araujo approached Gonzales and Logan, identified himself as a police officer, and

21 ordered them to approach his patrol vehicle. Detective Araujo testified that Gonzales stated he had a

22 gun, and that Gonzales' stance and hand movements suggested Gonzales was prepared to fight. As a

23 result, Detective Araujo drew his weapon. Detective Araujo's conduct would have communicated to

24 any reasonable person in Gonzales' position that he was not at liberty to ignore the police presence and

25 go about his business. Gonzales was seized for purposes of the Fourth Amendment.

26     The Fourth Amendment prohibition against unreasonable searches and seizures extends to brief

27 investigatory detentions of persons that fall short of a traditional arrest. United States v. Arvizu, 534

28 U.S. 266 (2002) citing United States v. Cortez, 449 U.S. 411, 417 (1981). To meet constitutional

1   muster investigatory stops or detentions must be justified by reasonable suspicion that criminal activity

2   may be afoot. Arvizu, 532 U.S. 273.  In assessing whether an officer has reasonable suspicion to

3   conduct an investigatory detention, reviewing courts look at the "totality of the circumstances" of each

4   case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal

5   wrongdoing. Arvizu, 534 U.S. at 273.  "An investigatory stop must be justified by some objective

6   manifestation that the person stopped is, or is about to be, engaged in criminal activity." United

7   States v. Cortez, 449 U.S. 411, 417 (1981).  A reviewing court's determination of reasonable suspicion

8   is a process that "allows officers to draw on their own experience and specialized training to make

9   inferences from and deductions about the cumulative information available to them that 'might well

10  elude an untrained person.'" Arvizu, 534 U.S. at 273, citing Cortez 449 U.S. at 418.  The Fourth

11  Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that

12  criminal activity may be afoot, and observation of factors which are by themselves consistent with

13  innocence may collectively amount to reasonable suspicion. Id. at 273-74.  Reasonable suspicion is not

14  a matter of hard certainties, but of probabilities. Cortez, 449 U.S. at 417-18.  However, reasonable

15  suspicion requires more than an officer's "hunch" even if the hunch later turns out to be a good one.

16  Terry, 392 U.S. at 27.  The reasonable suspicion standard is less than a preponderance of the evidence.

17  United States v. Sokolow, 491 U.S. 1, 7 (1989).

18       Under the totality of the circumstances presented here, the Court finds Detective Araujo had

19  reasonable suspicion to detain Gonzales in an investigatory detention of the bank robbery.  The bank

20  robbery occurred at approximately 10:25 a.m. on February 13, 2007, and was broadcast over the police

21  dispatch radio.  The bank robber handed the teller a demand note which stated he had a gun.  The teller

22  gave the robber money which included a B-pack device.  Ten minutes after the robbery, Officer

23  Davideit was on patrol in the area of Las Vegas Boulevard and Windmill, approximately three miles

24  from the scene of the robbery when he detected strong a signal on his patrol unit B-pack tracking

25  device.  As he approached the intersection of Las Vegas Boulevard and Windmill his patrol unit

26  tracking device registered the highest possible signal and pointed to the left where he observed two

27  vehicles, a black pick-up truck to his far left, and a teal green Chrysler 300 to his immediate left.  He

28  did a U-turn, and pulled behind the two vehicles.  His tracking device still registered the highest

1    possible level but he did not know which of the two vehicles contained the B-pack.

2         The black pick-up was driven by a black male.  Davideit could not see the occupants of the teal

3    Chrysler 300 because of the dark-tinted windows.  He did, however, see two figures inside the car.  The

4    teal green Chrysler headed north on Las Vegas Boulevard, and the pick-up truck entered I-15.  Davideit

5    elected to follow the pick-up truck and a traffic stop was conducted with the assistance of other officers

6    and an air support unit in the vicinity of I-15 and Sahara.  The teller was brought to the scene and

7    indicated the man in the pick-up truck was not the robber.  While the officers remained at the scene,

8    Davideit provided a fuller description of the green teal vehicle to other investigators indicating the

9    Chrysler 300 was teal green with dark tinted windows, chrome custom wheels, and the right rear

10   bumper was cracked.  While the investigating officers were at the site where the driver of the pick-up

11   truck had been stopped, dispatch broadcasted a report the south tower was hot again, indicating it was

12   registering a B-pack device.  Detective Araujo and other officers returned to the area where the robbery

13   had occurred to locate the Chrysler 300.

14        Detective Araujo pulled into a shopping center on Windmill, east of Las Vegas Boulevard to

15   observe traffic, and noticed a teal Chrysler 300 with a broken bumper coming off of Windmill at

16   approximately 11:45 a.m.  The Chrysler 300 had dark tinted windows, and he could not see inside.  He

17   observed two men get out of the car and go into The Smoke Shop.  The driver, Gonzales, did not match

18   the description of the bank robber.  However, the passenger fit the description of the bank robber.

19   Araujo described Logan as a black male, six-foot one to six-foot two with a large build, a big belly and

20   a scraggly beard.  Defense counsel noted several variations in the bank robber's description and

21   Logan's appearance and reported height and weight in police reports and records.  Defense counsel

22   correctly pointed out the bank robber, and Logan had been variously described with up to a three inch

23   height difference and up to a fifty pound weight difference.  Whether 5'11" or 6' 2" or whether 180 or

24   230 pounds, Logan is undisputably a large man with a big belly who was sporting facial hair at the time

25   he was stopped.  Additionally, a strong indicator to the Court that Logan did, indeed, fit the description

26   of the bank robber is the undisputed fact that when the teller was brought to the parking lot where

27   Logan and Gonzales were detained, the teller identified Logan as the bank robber.  Thus, despite some

28   differences in the physical description, the Court found the officers' testimony credible that they

1   believed that Logan fit the description of the bank robber at the time Logan and Gonzales were

2   detained.

3       Logan was not dressed as the bank robber was described.  However, in Detective Araujo's

4   experience, bank robbers often change their clothing after a robbery.  Information from the bank was

5   that the robber fled on foot, and no vehicle was described.  However, in Detective Araujo's experience

6   bank robbers frequently have help in the commission of robberies, and have get-away drivers.  Next,

7   although Gonzales and Logan were detained almost an hour and a half after the robbery occurred, they

8   were both observed inside the same vehicle Officer Davideit observed 10 minutes after the robbery

9   approximately three miles from the bank.  Officer Davideit's testimony was uncontroverted that his B-

10  pack tracking device registered the highest possible level when he approached the intersection of Las

11  Vegas Boulevard and Windmill and pointed to the left, where both the pick-up truck and the Chrysler

12  were located.  Davideit followed the pick-up truck because he could see a black male inside.  Because

13  of the dark tinted windows on the Chrysler, Davideit could not see the occupants of the Chrysler, but

14  recognized there were two people inside.  When the driver of the pick-up was pulled over and ruled out

15  as the robbery suspect by the eye-witness, the police logically looked for the only other vehicle Davideit

16  observed when his tracking device registered the maximum possible signal.

17      In short, the Court concludes that under the totality of the circumstances Detective Araujo had a

18  particularized and objective basis for conducting an investigatory detention of the occupants of the

19  Chrysler 300 he observed in the parking lot of The Smoke Shop three miles away from the bank

20  robbery an hour and a half after the robbery occurred.

21      **B.     The Pat Down**

22      After being detained and ordered to approach the police vehicle, Gonzales stated he had a gun.

23  Detective Araujo's initial testimony was that Gonzales immediately stated he had a gun before he was

24  ordered to the front of Araujo's patrol vehicle.  His report, however, indicates Gonzales stated he had a

25  gun after Araujo ordered Gonzales and Logan to the front of the patrol vehicle.  Detective Araujo

26  conceded that his report was written shortly after the incident, and the sequence he related in his report

27  was probably more accurate.  The Court agrees.  Either way, however, once Gonzales and Logan were

28  stopped on reasonable suspicion of involvement in a bank robbery, police were entitled to employ

14

1    reasonable methods to protect themselves.  Detective Araujo was aware that the bank robber's note

2    stated he had a gun.  More importantly, however, it is undisputed Gonzales told Detective Araujo he

3    had a gun.  Once Gonzales informed Araujo that he was carrying a firearm the officers were entitled to

4    seize the firearm to avoid any possibility that Gonzales would use it against them. United States v.

5    Willis, 431 F.3d 709, 717 (9th Cir. 2005).  The handgun recovered from Gonzales' person was not the

6    fruit of an illegal search.

7                                              **CONCLUSION**

8             The Court finds that under the totality of the circumstances presented here the police had

9    reasonable suspicion to conduct an investigatory detention of Gonzales and the passenger in the

10   Chrysler 300.  Once Gonzales stated he had a gun the officers were entitled to seize it for their own

11   safety.  Gonzales' 4th Amendment rights were not violated, and suppression of the handgun is not

12   required.

13            For all of the foregoing reasons,

14            **IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that

15   Defendant's Motion to Suppress Evidence for Fourth Amendment Violations (#12) be DENIED.

16            Dated this 3rd day of July, 2007.

17

18   _____
     PEGGY A. LEEN

19   UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

                                                  15